IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER SUNKIN, | ) | CASE NO. 5:15-CV-892 |
| *d/b/a Summit Automotive Equipment*, | ) | |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| HUNTER ENGINEERING COMPANY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

In April 2011, pro se Plaintiff Christopher Sunkin ("Sunkin"), acting on behalf of his long-time customer AT&T, purchased a vehicle alignment system manufactured by Defendant Hunter Engineering Company ("Hunter").  In this diversity action governed by Ohio law,[1] Sunkin alleges that Hunter misappropriated his trade secrets and tortiously interfered with his business relationship with AT&T when its sales representative sent his order, which contained information needed to complete the transaction, to Hunter's designated distributor.  Verified Complaint, Doc. 1-1.  Months later, the distributor, which sought payment from Sunkin after it paid Hunter, contacted AT&T to request help in its collection effort.  That contact resulted in AT&T terminating its relationship with Sunkin.  It also resulted in two lawsuits, this one and an earlier state court case between the distributor and Sunkin.[2]

---

[1] This case was removed by Hunter from the Summit County, Ohio, Court of Common Pleas.  Doc. 1. Subsequently, the parties consented to the jurisdiction of the undersigned.  Doc. 19.

[2] *See Ott Equipment Service, Inc. v. Sunkin*, CV-2012-03-1271, Summit County Court of Common Pleas, Ohio; Doc. 53-9, p. 6.  Sunkin was represented by counsel in that case, which settled.  Sunkin's deposition taken in that case has been filed in this case ("Sunkin 2012 Depo.").  Sunkin was deposed again in this case ("Sunkin 2016 Depo.").

1

Hunter has filed a Motion for Summary Judgment ("Motion") pursuant to Fed. R. Civ. Pro. 56. Doc. 53. The Motion has been fully briefed.[3] As is more fully explained below, Sunkin's claims against Hunter fail for a number of reasons, including that there is no genuine issue of material fact and Hunter is entitled to judgment as a matter of law on the issue of misappropriation. Accordingly, Hunter's Motion is **GRANTED**.

## I. Facts

### A. Parties and relevant individuals

Plaintiff Sunkin does business under the name Summit Automotive Equipment. He sells and services automobile service equipment, such as vehicle lift equipment. Verified Complaint, Doc. 1-1, ¶ 1; Sunkin 2012 Deposition ("Sunkin 2012 Depo."), Doc. 49-1, p. 22.[4] From 2001 to 2011, Sunkin provided services to AT&T, which consisted of him inspecting and repairing equipment at its fleet vehicle service garages on an as needed basis. Sunkin 2012 Depo., Doc. 49-1, pp. 23-28; Lindblom Depo., Doc. 52-1, pp.34-35.[5]

Defendant Hunter manufactures automotive and vehicle repair equipment such as wheel alignment systems, brake lathes, and vehicle lifts. Hudon Declaration ("Hudon Dec."), Doc. 53-2, ¶3. At the relevant time, Richard Hudon ("Hudon") was a sales representative for Hunter in Indianapolis. Id. Ott Equipment Service, Inc. ("Ott") was Hunter's distributor in the Indianapolis region pursuant to a Hunter Authorized Distributor Agreement. Id., ¶5; Deposition of Jack Ott, President of Ott ("Ott Depo."), Doc. 50-1, p. 23; Doc. 50-2 (distributor agreement).

---

[3] Hunter's brief in support of the Motion ("Hunter Br.") is Doc. 53-1. Sunkin's opposition brief ("Sunkin Opp.") is Doc. 56 and Hunter's reply brief ("Hunter Reply") is Doc. 57.

[4] Page numbers used herein refer to the ECF page numbers of documents filed with the Court.

[5] Sunkin had no guarantee from AT&T of future work. Sunkin 2016 Depo., Doc. 51-1, pp. 170-171; Deposition of Ron Lindblom ("Lindblom Depo."), Doc. 52-1, p. 50.

With the exception of national accounts, Hunter does not sell its equipment directly to customers.  Ott Depo, Doc. 50-1, p. 23.  Instead, the company's sales are made as follows: a Hunter sales representative, such as Hudon, meets with customers and promotes Hunter products.  Id.; Hudon Dec., Doc. 53-2, ¶3.  If a customer wishes to purchase Hunter equipment, the sales representative contacts the third-party regional distributor, in this case Ott, to obtain a price quote for the customer.  Ott Depo., Doc. 50-1, p. 23; Hudon Dec., Doc. 53-2, ¶7.  When the customer decides to order equipment, the sales representative sends the order to the distributor.  Ott Depo., Doc. 50-1, pp. 23, 29.  The distributor submits the order to, and purchases the equipment from, Hunter and pays Hunter for it; the distributor then bills the customer and the customer pays the distributor.  Hudon Dec., Doc. 53-2, ¶7.  Under Hunter's system, its sales representatives were not permitted to place an order directly with Hunter; only the distributor could place the order.  Ott Depo., Doc. 50-1, pp. 23-34.  Hunter insists on delivering and installing its equipment itself.  Sunkin 2016 Depo., Doc. 51-1, pp. 272, 312 (delivery by Hunter was "a precondition of the purchase"); Ott Depo., Doc. 50-1, p. 23.

### B. Equipment Order for AT&T's Indianapolis garage

In early 2011, in connection with its opening of a new vehicle service garage in Indianapolis,[6] AT&T contacted Sunkin to assist in relocating equipment from other garages and purchasing new equipment.  Sunkin 2016 Depo., Doc. 51-1, p. 45.  This was an expansion of Sunkin's relationship with AT&T; prior to March 2011, Sunkin had worked for AT&T on a smaller scale.  Id., pp. 63-64.  The Indianapolis project was the first time AT&T asked Sunkin to supply a large equipment item.  Id., pp. 63-65.  In the past, Sunkin had facilitated AT&T's

---

[6] The new Indianapolis garage was to be owned and operated by a third party entity, Kelley Amerit, under contract with AT&T.  Lindblom Depo., Doc. 52-1, pp. 44-47.

purchases of smaller equipment through parts distributors and AT&T had paid the distributors directly. Id., pp. 64-65.

Sunkin found Hudon's name on Hunter's website and contacted him to discuss ordering Hunter equipment for the AT&T job.  Id., pp. 53-55; Hudon Dec., Doc. 53-2, ¶8.  Thereafter, Sunkin and Hudon met with AT&T employees Steve Lewman and Dave Smith at the new Indianapolis garage in April 2011 to see the facility and to discuss what equipment would be appropriate for on-site installation.  Sunkin 2016 Depo., Doc. 51-1, p. 192; Hudon Dec., Doc. 53-2, ¶9.

Sunkin alleges that, prior to the meeting with AT&T, he and Hudon orally agreed to keep information about the transaction and the AT&T garage in Indianapolis confidential.  "It was explicitly conveyed to Hunter [via Hudon] that AT&T was a very important client ... and that all information conveyed would be solely for the purposes of delivery of equipment to AT&T facilities and that no disclosures of any sort, nor any competitive overtures" would occur.  Doc. 53-7, p. 11 (Sunkin responses to Hunter's interrogatories); *see also* Sunkin 2012 Depo., Doc. 49-1, p. 84; Sunkin 2016 Depo., Doc. 51-1, p. 248.  The alleged confidentiality agreement was not committed to writing.  Sunkin 2016 Depo., Doc. 51-1, pp. 73–74.  Hudon does "not recall any conversations or communications with Mr. Sunkin where he told me that the location of the AT&T service center located on Bluff Road and Indianapolis was confidential."  Hudon Dec., Doc. 53-2, ¶16.

After the Indianapolis meeting, Sunkin and Hudon agreed to a list of equipment.  Sunkin 2016 Depo., Doc. 51-1, pp. 192-195.  Hudon stated that he told Sunkin at the meeting "that the equipment would come through Ott Equipment, the authorized Hunter distributor for the area."  Doc. 53-2, ¶10.  The price quote Hudon gave Sunkin bore the legend, "Quoted through: An

4

authorized distributor." Doc. 51-11. Sunkin admits that Hudon told him that Hudon would "need to run this through a distributor." Sunkin 2012 Depo., Doc. 49-1, pp. 41-43. However, Sunkin denies that Hudon identified Ott as the distributor. Sunkin 2012 Depo., Doc. 49-1, p. 43-44. Sunkin regarded Ott as a direct competitor. Doc. 1-1, ¶5. He testified that he would have walked away from the deal if Hudon had told him that Ott was the distributor. Sunkin 2016 Depo., Doc. 51-1, p. 309.

At the time of the transaction, Sunkin had been in business for many years and was generally familiar with the use of distributors by manufacturers. Sunkin 2012 Depo., Doc. 49-1, pp. 44-45. He specifically knew that Hunter used distributors because, at one time, he had met with Hunter representatives to discuss becoming a Hunter distributor, an opportunity he chose not to pursue. Sunkin 2016 Depo., Doc. 51-1, p. 147, 153-154. Sunkin was a distributor for another manufacturer, Mohawk. Id., p. 50. Mohawk would sometimes sell directly to a customer and he would get a check if the sale was in his territory. Id., p. 158. He knew that different manufacturers operate differently and that distribution arrangements also change from time to time. Id., p. 308. He did not know how Hunter's distributor arrangements worked. Id., p. 150 ("I had no idea how they sold."); id., p. 155 ("I knew that they used distributors, but I didn't know any of the details on how any of it worked."). He did not ask Hudon what Hudon meant when he said he would need to run the transaction through a distributor. He testified that, since Hudon, not he, was the one who would be dealing with Hunter's distributor, "His [Hudon's] backend of how he placed this order was of no consequence to me." Sunkin 2012 Depo., Doc. 49-1, pp. 43-44.

Hudon sent Sunkin a price quote in the form of an Equipment Proposal/Sales Agreement dated April 8, 2011, for $59,148.75. Doc. 51-11 (Equipment Proposal/Sales Agreement

5

("Proposal") dated 4/8/11); Sunkin 2016 Depo., Doc. 51-1, pp. 192-195.  The Proposal indicated that the prices were quoted through "An authorized distributor." Doc 51-11.  Ott's name does not appear on the Proposal.  Doc 51-11; Doc. 53-1, p. 8; Doc. 51-1, pp. 192-195.  Sunkin obtained approval for the order from Steve Lewman at AT&T.   Sunkin then sent a Purchase Order to Hudon for a vehicle alignment system in the amount of $59,148.75.  Doc. 51-14 (Purchase Order dated 4/20/11); Sunkin 2016 Depo., Doc. 51-1, pp. 192, 202, 209.  The Purchase Order stated the name of the purchaser (AT&T) and address to which the equipment was to be shipped and gave a phone number for that address.  Doc. 51-14.  Hudon "referred," i.e, sent, Sunkin's Purchase Order to Ott, and Ott placed Sunkin's Order directly with Hunter.  Doc. 53-2, ¶11.  Thereafter, Hunter delivered the equipment to AT&T's Indianapolis garage and installed it there.  Hudon Dec., Doc. 53-2, ¶11; Ott Depo., Doc 50-1, p. 99.

## C. Sunkin's Failure to Pay and Ott's Collection Efforts

Shortly after the vehicle alignment system was delivered, AT&T paid Sunkin in full on his invoice in the amount of $73,527.19.  Doc. 51-13 (invoice dated 4/12/11); Doc. 51-17 (check).  On or about May 18, 2011, Ott paid Hunter for the equipment and invoiced Sunkin for $59,148.75.  Ott Affidavit, Doc. 50-9, p. 2, ¶12; Doc. 50-10.  Sunkin denies he saw the invoice before September 2011.  Sunkin 2016 Depo., Doc. 51-1, pp. 229-230, 243, 257-258.  In September, Ott telephoned and emailed Sunkin to request payment.  Ott Depo., Doc. 50-1, pp. 77-81; Doc. 50-11.  Sunkin still did not pay.  Sunkin 2012 Depo., Doc. 49-1, pp. 88-89; Sunkin 2016 Depo., Doc. 50-1, pp. 80-81.  Sunkin said that he did not know who Ott was and that he needed to investigate the matter.  Sunkin 2016 Depo., Doc. 51-1, pp. 243, 257-258; Ott Depo., Doc. 50-1, p. 78.

Ott sought Hunter's assistance in collecting from Sunkin but Hunter declined to assist. Ott Depo., Doc. 50-1, pp. 85-88. Jack Ott then telephoned AT&T and asked AT&T employee Melissa Nagle whether AT&T had paid Sunkin for the equipment installed at the Indianapolis garage.[7] Ott Depo., Doc. 50-1, p. 48. Nagle told him that AT&T had paid Sunkin. Id. Ott told Nagle that Sunkin had not paid him, and Nagle told him to call Ron Lindblom (an AT&T manager) and gave him Lindblom's phone number. Id., pp. 48, 52-53. Ott called Lindblom and asked Lindblom to help him obtain payment from Sunkin. Ott told Lindblom how much he had billed Sunkin and followed up with an email to Lindblom. Id., pp. 48-49. Lindblom called Sunkin and asked why he had not paid Ott. Sunkin 2016 Depo., Doc. 51-1, p. 75. Sunkin testified that Lindblom also commented on Sunkin's price markup on the equipment he had sold to AT&T (Sunkin 2016 Depo., Doc. 51-1, pp. 75–76); Lindblom denies that he mentioned Sunkin's profit. Lindblom Depo., Doc 52-1, pp. 71, 79. Shortly after that conversation, Lindblom informed Sunkin that AT&T was terminating its relationship with him. Lindblom Depo., Doc. 52-1, pp. 71–72. Sunkin believes AT&T terminated him because it learned of his profit on the transaction. Sunkin 2016 Depo., Doc. 51-1, pp. 254-255. Lindblom denied that and testified he terminated Sunkin because Sunkin failed to pay Ott and AT&T does not wish to do business with people who don't pay their bills. Lindblom Depo., Doc. 52-1, pp. 76-77.

Ott, still having received no payment from Sunkin, sued Sunkin in Ohio state court for the unpaid debt; Sunkin counterclaimed for tortious interference with a business relationship. *See Ott Equipment Service, Inc. v. Sunkin*, CV-2012-03-1271, Summit County Court of Common Pleas, Ohio; Doc. 53-9, p. 6. The parties settled. Doc. 53-1, p. 14.

---

[7] Ott testified that he called the AT&T switchboard "asking for somebody related to this project" and was given Nagle's name. Ott Depo., Doc. 50-1, p. 52.

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).

Once the moving party has met its burden, the non-moving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 256; *Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–248 (emphasis in original).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

## III. Analysis

**A.  Misappropriation of trade secrets claim**

8

The Ohio Uniform Trade Secrets Act ("OUSTA"), Ohio Revised Code § 1333.61, *et seq.*, authorizes an action for misappropriation of trade secrets. In order to prevail, a plaintiff must show "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Thermodyn Corp. v. 3M Co.*, 593 F.Supp.2d 972, 985 (N.D.Ohio 2008). A plaintiff bears the burden of proving the elements of the claim, including that information is a trade secret. *Id.* (citing *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373 (2000)).

Under the OUSTA, a "trade secret" is:

[I]nformation, including . . . any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

R.C § 1333.61(D). To evaluate whether a trade secret exists, Ohio courts consider the following six factors:

1. the extent to which the information is known outside the business;

2. the extent to which it is known to those inside the business, i.e., by the employees;

3. the precautions taken by the holder of the trade secret to guard the secrecy of the information;

4. the savings effected and the value to the holder in having the information as against competitors;

5. the amount of effort or money expended in obtaining and developing the information; and

6. the amount of time and expense it would take for others to acquire and duplicate the information.

9

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997); *Thermodyn Corp.*, 593 F.Supp.2d at 986. Whether information is a trade secret is "a highly fact-specific inquiry." *Id*. (citing *DeBoer Structures Inc. v. Shaffer Tent & Awning Co.*, 233 F.Supp.2d 934, 948 (S.D.Ohio 2002)).

### 1. Trade secrets claimed by Sunkin

In his Verified Complaint, Sunkin does not define precisely what he claims to be a trade secret. He alleges,

> 9. In a physical meeting at the AT&T/Kelly Amerit facility in Indianapolis, the Plaintiff and Mr. Hudon made mutual agreements that; a), that the relationship, business arrangement and all information and details regarding such between the Plaintiff and his customer, AT&T, would remain confidential between Sunkin and Hunter; b), that any and all contact regarding this and any other transaction would be made exclusively and without exception by the Plaintiff; c), that information about this business relationship, information regarding the identities of the key individuals at AT&T and Kelly Amerit and all other information being shared for the purposes of this singular Transaction, constituted confidential information that was the sole property of the Plaintiff, and d), that none of this information would be shared with any other individual or entity, nor would there be any attempt on Hunter's behalf to solicit business using this information.

Doc. 1-1, ¶9.

In his deposition, Sunkin stated that his trade secrets involved "two pieces" of proprietary information, but he proceeded to describe three: "The first is the contact information for AT&T managers. The second is just the existence of my relationship with AT&T. And the third would be the amount of [sic] which the transaction was placed for." Doc. 51-1, pp. 265-266.[8] In his Opposition Brief, Sunkin appears to define his trade secrets as the "new maintenance facility being constructed in the Indianapolis market," "Mr. Lindblom's or any other decision

---

[8] Similarly, in his answer to Hunter's interrogatories, Sunkin described his confidential and trade secret information as "confidential business location information and physical access to this secure facility. Mr. Hudon was also introduced to individuals responsible for the management of this facility and possessing purchase decision making responsibility." Doc. 53-7, pp. 4-5.

making manager's contact information and area of responsibility," and the purchase price that Sunkin was billed by Ott for the equipment ($59,148.75).[9]  Doc. 56, pp. 4-6.

Thus, the identity of Sunkin's claimed trade secrets can be boiled down to four separate pieces of information: (1) AT&T manager names and contact information; (2) the purchase price of the equipment that Sunkin was quoted and billed for by Ott; (3) the existence of AT&T as a customer; and (4) the location of the Indianapolis garage.

### a. There is no genuine issue that AT&T's manager names and contact information are not trade secrets

Sunkin uses vague descriptions such as "key individuals at AT&T" (Doc. 1-1, ¶9), but does not identify these individuals in his Verified Complaint.  In his Opposition brief, he refers to "Mr. Lindblom and the other managers and decision-makers within AT&T."  Doc. 56, p. 4.  Sunkin's failure to identify any name(s) other than Lindblom is fatal to any claim pertaining other individuals;[10] the party claiming a trade secret "bears the burden of identifying and demonstrating that the information is protected under this statute[.]"  *Cary Corp. v. Linder*, 2002 WL 31667316, at *5 (Oh. Ct. App. Nov. 27, 2002) (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853 (Ohio 1999)).  To the extent he contends Lindblom's name is a trade secret, there is no evidence in the record that Hunter's sales representative ever disclosed Lindblom's name to Ott.  Rather, Ott talked to Lindblom after being referred to Lindblom by another AT&T employee whom he reached after contacting AT&T's switchboard.  Accordingly,

---

[9] Sunkin does not provide any citations to the record in his opposition brief.  The Court notes that, in addition to numerous documents attached as exhibits in this case, there are 756 pages of deposition testimony that have been filed on the docket.  It is not the Court's duty to scour the record in search of evidence to support Sunkin's claims. *See, e.g.,* Doc. 22, p. 4 (Case Management Conference Order: "All facts presented to the Court in any brief or memorandum setting forth a party's position with respect to a motion must be supported by pinpoint citations to the case record.").

[10] Sunkin and Hudon met with two AT&T managers in Indianapolis in April 2011.  Sunkin does not allege that their names are trade secrets or that Hudon gave their names to Ott, nor is there any evidence Ott had or used their names.

11

Sunkin has not met his burden of identifying the AT&T manager names and contact information that he argues are protected under OUTSA.  Hunter is entitled to judgment as a matter of law on this claim.

### b. There is no genuine issue that the pricing information is not a trade secret

Sunkin believes Lindblom's unhappiness over his profit led to the termination of his relationship with AT&T.  Sunkin 2016 Depo., Doc. 51-1, pp. 254-255.  AT&T needed two pieces of information to calculate Sunkin's profit: his price to AT&T and Ott's price to him.  Sunkin himself gave AT&T the first piece when he billed AT&T $73,527.19.  Ott gave AT&T the second when Jack Ott told Lindblom the amount Ott had billed Sunkin, $59,148.75.  Doc. 52-5 (Ott email to Lindblom).

Although pricing information can be a trade secret, *Thermodyn*, 593 F.Supp.2d at 986, the price that Ott billed Sunkin was not Sunkin's proprietary information any more than Hunter's price to Ott would be, as Sunkin admitted:

> Q.  [] Hunter's pricing to its distributors is not a trade secret of yours is it?
> ***
> A.  – is a trade secret of mine?  No, of course not.

Sunkin 2016 Depo., Doc. 51-1, p. 289.

Because Ott's price to Sunkin is not Sunkin's trade secret, his claim with respect to pricing information fails.[11]

### c. There is a genuine issue as to whether Sunkin's relationship with AT&T and the location of the Indianapolis garage constitute trade secrets

---

[11] In addition, as is discussed below, there is no evidence that Ott was acting as Hunter's agent when Ott contacted Lindblom.

12

In his Opposition Brief, Sunkin argues that the existence of AT&T as his customer and the location of the Indianapolis garage are trade secrets.  Doc. 56, pp. 4-5.  Hunter contends that this information is not a trade secret because it is readily available to the general public and "openly available on the market."  Doc. 53-1, p. 17.[12]

Applying the six-factor approach set forth in *The Plain Dealer, supra*, the Court finds that there exist genuine issues of material fact regarding whether the fact that AT&T was Sunkin's customer and the location of the Indianapolis garage were trade secrets.

First factor (the extent to which the information is known outside the business): Sunkin stated in his deposition that this information is not well known outside his business.  He asserted that contact information for AT&T and the Indianapolis garage are unpublished and the physical facilities at the garage are unmarked and gated to keep them anonymous.  Sunkin 2016 Depo., Doc. 51-1, pp. 267–269.  AT&T's Lindblom testified that the location of the Indianapolis garage "was not something that we kept from the public, but we didn't advertise it."  Lindblom Depo., Doc. 52-1, p. 46.  He also stated that the garage did not have an AT&T sign out front, explaining,

> that was not an AT&T facility.  See, that—that was unique. That was the first, I believe, of many that were coming down the road because we were ... transitioning from a company operation to a complete outsourced operation. I believe that was one of—I think there was a couple other garages in the AT&T footprint that we were setting up like this.

Id., p. 47.  That the Indianapolis garage location was considered "unique" and the first of many while AT&T transitioned to another method of operation further indicates that the garage location was not well known outside the business.  When asked what sort of information an AT&T contractor like Sunkin would have been expected to keep confidential, Lindblom answered,

---

[12] Hunter also states that Sunkin's Responses to its Requests for Admission admit that the fact that AT&T was his customer is not a trade secret. Hunter Br., Doc. 53-1, p. 11 n.14.  The Court disregards this statement because, while Hunter has provided a copy of its Requests for Admission (Ex. G to its Brief, Doc. 53-8), it has not provided Sunkin's Responses.

> I mean, just about everything. . . . they were not at liberty to share numbers, information of any kind, with anyone other than AT&T.

Id., p. 51.  Lindblom also stated that Sunkin should not have shared the information that AT&T was purchasing equipment from him "with anyone," (Id., p. 57) although he conceded that it would be expected, reasonable and understandable that a contractor such as Sunkin, while purchasing equipment, would give out the address of the AT&T garage (Id., p. 65).[13]  And, although Hunter asserts that the locations of AT&T garages "are not kept from the general public" and are "readily available to the general public" (Doc. 53-1, p. 17),  Lindblom merely stated that the locations were available "to anyone who had a need to know" such as vendors. Lindblom Depo. Doc. 52-1, pp. 46-47.  Lindblom's testimony does not support a conclusion that the garage locations are readily available to the general public.  Taking the facts in the light most favorable to Sunkin, the first *Plain Dealer* factor weighs in his favor.

Second factor (the extent to which the information is known to those inside the holder's business): This factor also weighs in Sunkin's favor.  He has no employees and he stated that the only person he told about his work with AT&T was his wife.  Doc. 51-1, pp. 37, 276.

Third factor (the precautions taken by the holder to guard the secrecy of the information): There are disputed issues of fact regarding the third factor.  Sunkin asserts that he had an oral confidentiality agreement with Hudon.  Hudon does not recall any such agreement. Hudon Dec.,

---

[13]  When asked if the location of AT&T garages is confidential, Lindblom gave a confusing answer:

> I agree with that—well, let me just clarify that.  I mean, this is the information where you go into confidentiality.  I do not want a Chris Sunkin, a vendor, to take all of our locations and share that with everyone.  But as a need to know a garage location, anyone, that—that is not confidential to the general public or anything else.

Lindblom Depo., Doc. 52-1, p. 83.

14

Doc. 53-2, p. 3 ¶16. Assuming there was a confidentiality agreement,[14] Sunkin arguably failed to take adequate precautions because he admits that Hudon told him he would have to run the transaction through a distributor but he did not inquire about who the distributor was or what information would be given to the distributor. "His [Hudon's] backend of how he placed this order was of no consequence to me." Sunkin 2012 Depo., Doc. 49-1, pp. 43-44. However, taking the facts in the light most favorable to Sunkin, there is evidence that, if believed, supports his assertion that he told Hudon that the name of his client (AT&T) and the location of the Indianapolis garage were confidential and should not be disclosed.

Fourth factor (the value of keeping the information secret so that competitors will not solicit business): This factor weighs in Sunkin's favor. Sunkin testified that roughly a third of his total income over the previous decade came from his relationship with AT&T, calling it his "biggest, best, easiest to deal with, most profitable" customer. Doc. 51-1, p. 259. He stated that he had keys to their facilities and they trusted him. Doc. 51-1, p. 260. Lindblom agreed; he testified in his deposition, "I'd dealt with Chris Sunkin for a number of years, and had no issues whatsoever. He was almost a model vender. Always there when we needed him, and performed any service that we requested, reasonable prices." Doc. 52-1, p. 69. AT&T utilized Sunkin "quite a bit" in a variety of ways in numerous states. Doc. 52-1, p. 53. And AT&T selected him to purchase the equipment for the Indianapolis garage based on the recommendation of an AT&T manager who had worked with Sunkin before; at meetings, Lindblom stated, AT&T personnel would exchange information about good venders in the geographical area. Doc. 52-1, pp. 32-33. Evidence suggests that Sunkin developed a relationship with AT&T and that AT&T personnel continued to use him on existing projects and chose him for the expansion involving the

---

[14] A confidentiality agreement would not by itself establish that the information was a trade secret. *Thermodyn*, 593 F.Supp.2d at 987.

15

Indianapolis garage.  Thus, the value of the customer name and garage location to Sunkin was great.

Fifth factor (the amount of effort or money expended in obtaining and developing the information): This factor weighs in favor of Sunkin because, although he expended little effort at first in obtaining AT&T as a client—he testified that AT&T reached out to him unsolicited, based on his affiliation with a manufacturer that AT&T was looking to do business with (Doc. 49-1, pp. 23-24)—he expended more effort developing his relationship with AT&T.  He spent the decade before the transaction at issue cultivating sources within the company through regular, and sometimes daily, contacts.  Doc. 49-1, pp. 26–27.

Sixth factor (the amount of time and expense it would take for others to acquire and duplicate the information): This factor also weighs in favor of Sunkin.  Lindblom testified that AT&T sought out Sunkin because of his established reputation (Doc. 52-1, p. 86, 59) and Sunkin testified that it took him years to develop his relationship with AT&T (Doc. 51-1, p. 60; Doc. 49-1, p. 46).

The *Plain Dealer* factors thus weigh in favor of Sunkin; there is a genuine issue of material fact, therefore, whether the customer name "AT&T" and the location of the Indianapolis garage were Sunkin's trade secret information.  *See DeBoer Structures Inc.*, 233 F.Supp.2d at 948 ("Whether information qualifies as a trade secret is ordinarily 'a question of fact to be determined by the trier of fact upon the greater weight of the evidence[,]'" quoting *Fred Siegel Co. L.P.A.*, 707 N.E.2d 853 (syllabus)).

### 2. There is no genuine issue that Hunter did not misappropriate Sunkin's alleged trade secrets

Sunkin fails to establish that Hunter misappropriated his customer's name (AT&T) and the location of the Indianapolis garage.  As a result, Sunkin cannot establish all three elements of

16

his trade secret claim and Hunter is entitled to judgment as a matter of law. *See Thermodyn Corp.*, 593 F.Supp.2d at 987 (a plaintiff must establish three elements to prevail on a trade secrets claim).

OUTSA defines misappropriation as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

R.C. § 1333.61(B).

Sunkin argues that Hunter misappropriated his trade secrets when:

Hudon improperly conveys this [trade secret] information to, and then improperly assigns a purchase order made out to Hunter engineering to a third party, Ott Equipment, without [Sunkin's] knowledge or approval.

Sunkin Opp. Br., Doc. 56, p. 11.[15]

Although Sunkin does not describe how Hudon "convey[ed]" the information to Ott, the evidence of record shows that Hudon "referred," i.e., sent, Sunkin's Purchase Order to Ott. The Purchase Order contains shipping information consisting of the address and a phone number for

---

[15] Hunter does not challenge Sunkin's assertion that it is responsible for the acts of its sales representative, Hudon, performed in connection with the placing of Sunkin's order.

17

the Indianapolis garage and the name of the purchaser, AT&T.  *See* Doc. 51-14 (Purchase Order).

Misappropriation cannot occur when the person holding the trade secret gives express or implied consent to disclose the information.  R.C. § 1333.61(B).  Here, Sunkin gave implied consent to disclose the Indianapolis garage location to Hudon.  Sunkin admits he knew Hudon would have to run the transaction through a distributor.  Sunkin 2012 Depo., Doc. 49-1, p. 41. He also knew that Hunter always delivered and installed its own equipment and that Hudon would therefore have to provide information regarding the location to which the equipment was to be delivered in order to complete the transaction.  Sunkin 2016 Depo., Doc. 51-1, p. 272.  He did not inquire about the details of what Hudon would convey to the distributor: "[H]is [Hudon's] back end of how he placed this order was of no consequence to me."  Sunkin 2012 Depo., Doc. 49-1, pp. 43-44.

Hudon and Ott followed Hunter's normal practice and rules when Hudon referred Sunkin's order to Ott and when Ott placed the order with Hunter.  Ott could not place the order with Hunter without having the address information to instruct where the equipment would be delivered.  Accordingly, assuming, as Sunkin alleges in his Verified Complaint, that he and Hudon had an oral agreement that "the relationship, business arrangement all information and details regarding such between the Plaintiff and his customer, AT&T, would remain confidential between Sunkin and Hunter," (Doc. 1-1, ¶9), Sunkin gave implied consent for AT&T's name and the location of the Indianapolis garage to be used to facilitate the business transaction.  As Sunkin himself concedes,

> Mr. Hudon was well-aware ... that he was being provided with information <u>solely for the purposes of delivering the equipment as ordered.</u>  As such, Mr. Hudon and his employer, Defendant Hunter, held a duty to the plaintiff under the Uniform Trade Secrets Act <u>to not

18

<u>use this information in any fashion other than that authorized, nor to provide this information to parties outside of this business arrangement.</u>

Sunkin Opp. Br., Doc. 56, p. 9 (emphasis supplied).

There is no evidence that <u>Hunter</u> used Sunkin's alleged trade secret information for any purpose other than to complete the business transaction.  Hudon conveyed AT&T's name and the location of the Indianapolis garage solely for the purposes of facilitating the ordering and proper delivery of the equipment, as authorized by Sunkin.  Ott was not "outside of this business arrangement" because a distributor was required to be involved and Sunkin knew that.  Hudon did not improperly assign a purchase order to Ott or improperly use Sunkin's alleged trade secret information.  Hudon acted with Sunkin's implied consent and did not misappropriate Sunkin's alleged trade secret information.

Because <u>Hunter</u> did not misappropriate Sunkin's alleged trade secret information, Hunter is entitled to judgment as a matter of law on Sunkin's OUTSA claim.

### B. Tortious interference with business relationships

Sunkin argues that Hunter interfered with his business relationship with AT&T when Ott contacted Lindblom seeking its assistance in collecting from Sunkin and that, as a result of that contact, AT&T cancelled its business relationship with Sunkin.  Sunkin Opp. Br., Doc. 56, p. 11.

"The tort of interference with a business relationship occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another."  *Harris v. Bornhorst*, 513 F.3d 503, 522-523 (6th Cir. 2008) (quoting *McConnell v. Hunt Sports Enters.*, 725 N.E.2d 1193, 1216 (Ohio Ct. App. 1999)).  The elements of tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom.  *Id*.

Sunkin complains of Ott's actions but provides no evidence that <u>Hunter</u> induced or purposely caused AT&T to end its business relationship with Sunkin.  He has not presented any evidence establishing that Hunter's conduct, as distinguished from Ott's, intentionally interfered with his relationship with AT&T.  *See id*.  Instead, the evidence points to only one conclusion—Hudon disclosed AT&T's name and the location of the Indianapolis garage to Ott for the purpose of completing the sales transaction.  Hudon did not disclose the information with the intention that Ott would communicate with AT&T to inquire about Sunkin's bill and interfere with his business relationship.  Moreover, Ott communicated with AT&T on its own behalf to collect the monies Sunkin owed Ott.  Ott did not contact AT&T on behalf of Hunter, which had already been paid by Ott.   Although Sunkin refers to Ott as "Hunter's agent" in his Verified Complaint (Doc. 1-1, ¶ 19), he has provided no evidence that Ott was acting as Hunter's agent <u>at the time Ott contacted AT&T</u>.  Indeed, the evidence is to the contrary: Hunter had declined to assist Ott in its collection efforts against Sunkin.  Ott Depo., Doc. 50-1, pp.85-86.  There is no evidence to support Sunkin's tortious interference claim, and, therefore, Hunter is entitled to judgment on that claim.

### IV. Conclusion

For the reasons stated above, Hunter is entitled to judgment as a matter of law on both claims alleged by Sunkin in his Verified Complaint, i.e., misappropriation of trade secrets and interference with business relationships.  Accordingly, the Court **GRANTS** Hunter's Motion for Summary Judgment (Doc. 53).

IT IS SO ORDERED.

September 27, 2016

_____
Kathleen B. Burke
United States Magistrate Judge